John S. Persell, OSB # 084400
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

Nicholas S. Cady, OSB # 113463
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434-1463
nick@cascwild.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon non-profit corporation; and **OREGON WILD**, an Oregon non-profit corporation,<br><br>       Plaintiffs,<br><br>       v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT**, a federal agency,<br><br>       Defendant. | Case No. 6:23-cv-1358<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Environmental Matters – Violations of Federal Land Policy and Management Act; National Environmental Policy Act; Administrative Procedure Act) |

## INTRODUCTION

1.      Plaintiffs Cascadia Wildlands and Oregon Wild (collectively, "Plaintiffs" or "Cascadia") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to the final administrative action of the United States Bureau of Land Management, Coos Bay District, Myrtlewood Field Office ("BLM" or "Defendant"). In issuing the Big Weekly Elk Forest Management Project Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), Defendant acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*

2.      The Big Weekly Elk Project area lies within 35 miles of the Pacific Coast in Coos County, Oregon. Within the project area, the BLM authorized logging across 3,608 acres of forests including structurally complex, late-successional forest habitat, commonly known as old-growth, which supports several species of wildlife protected under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 – 1544, including northern spotted owls and marbled murrelets. The logging will largely be located within reserves specifically created to protect and restore habitat for spotted owls and murrelets.

3.      Despite the fact that the primary objectives for the areas targeted for logging are to protect and restore habitat for these two species, the BLM did not analyze in detail the impacts the proposed logging would have on these species in the EA or FONSI. In other words, the tradeoffs between logging and species protection were not weighed by the agency decision-maker within a land use allocation where species protection is the preeminent consideration.

4.      This is incredibly concerning here because the BLM is also openly violating requirements in its Resource Management Plan ("RMP") to buffer occupied murrelet habitat from logging and

road-building activities. Murrelets are highly sensitive to these activities, and within the Big Weekly Elk Project area the BLM is either not buffering occupied habitat or only applying impermissibly small buffers in occupied murrelet habitat. Logging and associated road-building will likely prevent murrelets from successfully nesting in these areas. And the impacts from this logging are extensive: 55 occupied murrelet sites overlap the project area and will be impacted.

5.      Additionally, five known spotted owl sites will be logged, and suitable habitat will be downgraded and removed, including habitat in nest patches. The RMP strictly prohibits the "take" of spotted owls, but an analysis of impacts to these sites did not occur in the EA or FONSI.

6.      Despite the Project's large scale, and the number of resources adversely impacted by clearcut logging operations, the BLM refused to prepare a searching and careful Environmental Impact Statement ("EIS") and otherwise failed to take the requisite "hard look" at the Project's impacts as required by NEPA. The agency gave no in-depth consideration to the Project's effects on, inter alia, protected fish and wildlife species, invasive species infestations, detrimental soil disturbance, or carbon sequestration and greenhouse gas emissions.

7.      Having predetermined that these issues merited no detailed consideration, the BLM failed to gather any relevant site-specific data or fully analyze and disclose the Project's potential site-specific impacts. Instead, the EA relied on a generalized 2016 analysis of all 2.5 million acres of BLM land in western Oregon which contained no site- or project-specific detail.

8.      There will also be several other forest management actions in the same area that overlap in time and that will together result in a significant loss of suitable northern spotted owl habitat and other significant cumulative impacts on northern spotted owls, marbled murrelets, carbon storage

and emissions, and other resources and values. The BLM also failed to analyze these cumulative impacts.

9.      Overall, the BLM's failure to sufficiently analyze the direct, indirect, and cumulative impacts of the Big Weekly Elk Project is arbitrary, capricious and an abuse of discretion. The Big Weekly Elk Project EA proposes open violations of mandatory RMP standards and simply does not contain adequate support for the BLM's conclusion that the Project will have no significant impacts.

10.     This action seeks: 1) a declaration that the BLM violated NEPA and its implementing regulations by failing to take a hard look at and adequately analyze the Big Weekly Elk Project's significant impacts; 2) a declaration that the BLM violated NEPA and its implementing regulations by failing to prepare an EIS; 3) a declaration that the BLM violated FLPMA and its implementing regulations by failing to conform the Project to the 2016 RMP; and 4) the vacatur and remand of the Big Weekly Elk Project to the BLM.

11.     The requested relief is necessary to prevent unlawful agency action and to forestall irreparable injury to Cascadia and to the environment. If necessary, Cascadia intends to seek narrowly tailored injunctive relief during the pendency of this litigation.

12.     Should Cascadia prevail, Cascadia will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346. Final agency action has occurred that is subject to judicial review pursuant to 5 U.S.C. §§ 704–706. An actual, justiciable controversy exists between Plaintiffs and Defendant. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14.    Cascadia has exhausted its administrative remedies by timely participation throughout the BLM's planning process for the Big Weekly Elk Project. Release of the FONSI constitutes final agency action subject to review.

15.    Venue is proper in this Court under 28 U.S.C. § 1391 because all, or a substantial part, of the events or omissions giving rise to this litigation occurred within this judicial district. The BLM officials who authorized the decisions at issue maintain offices within this judicial district. The decisions at issue were developed and signed within this judicial district.

16.    This case is properly filed in the Eugene Division pursuant to Local Rule 3-2 because the Big Weekly Elk Project area and the Defendant's office where the FONSI was signed are located in Coos County, Oregon. The events or omissions giving rise to these claims are situated in the Eugene Division.

## PARTIES

17.    Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion.

18.    Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon, and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds

programs protect pristine drinking water, unparalleled recreation opportunities, and vital fish and wildlife habitat across Oregon.

19.     Plaintiffs and their members, supporters, and staff have concrete aesthetic, recreational, spiritual, scientific, and professional interests in the Big Weekly Elk Project area.

20.     Plaintiffs' members, supporters, and staff regularly visit and enjoy the Big Weekly Elk Project area—including the areas in which the BLM has offered and is preparing timber sales—and have concrete plans to do so in the future. Plaintiffs' members, supporters, and staff use the project area to hike, camp, enjoy nature, attempt to observe wildlife (including northern spotted owls, marbled murrelets, and salmon), photograph wildlife and forest ecosystems, and otherwise enjoy the aesthetics and scientific bounty of the Big Weekly Elk area.

21.     Plaintiffs' members, supporters, and staff intend to return to the Big Weekly Elk Project area in the near future to recreate and otherwise enjoy the project area. Plaintiffs' members, supporters, and staff are less likely to revisit the project area if the Big Weekly Elk Project is implemented as approved; if Plaintiffs' members, supporters, and staff do return, their ability to observe wildlife and intact forest ecosystems will be significantly and permanently impaired by the project activities.

22.     Plaintiffs and their members, supporters, and staff would sustain concrete injury to their aesthetic, recreational, spiritual, scientific, and professional interests in the Big Weekly Elk Project area if the BLM implements the Big Weekly Elk Project as authorized.

23.     Plaintiffs have organizational interests in the proper and lawful management of the project area. Plaintiffs and their members, supporters, and staff have actively participated in the project's administrative processes. Plaintiffs and their members, supporters, and staff expend significant resources to track management activities on these lands, comment on agency

proposals, work with BLM staff on the development of land management plans, and field-check federal projects on these lands.

24.     Plaintiffs submitted scientific literature that conflicts with the BLM's conclusions. The BLM did not substantially address this opposing evidence, as it would have been required to do in an Environmental Impact Statement ("EIS").

25.     Plaintiffs and their members, supporters, and staff are thus procedurally harmed by the BLM's failure to comply with federal law.

26.     Additionally, Plaintiffs' injuries are predicated on unlawful BLM actions that have diminished the trust between the BLM and the conservation community; facilitated the risk of unsupported and uninformed management and decision-making; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to Plaintiffs and their interests.

27.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior charged with administering public lands and resources in accordance with federal laws and regulations. The BLM administers roughly 2.5 million acres of forest in western Oregon, including 325,000 acres managed by the BLM's Coos Bay District, where the Big Weekly Elk EA and FONSI were completed.

## LEGAL BACKGROUND

### Administrative Procedure Act

17.     The Administrative Procedure Act ("APA") confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. *Id.* § 704.

18.     Upon review under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. *Id.* § 706(2)(A), (C), (D).

**National Environmental Policy Act**

19.     Congress enacted the National Environmental Policy Act ("NEPA") to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

20.     To accomplish these purposes, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

21.     NEPA requires federal agencies to prepare, consider, publicly disclose, and approve a "detailed statement" describing the environmental impacts of and alternatives to any major federal action which may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). This detailed statement, known as an environmental impact statement, or "EIS," must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts" 40 C.F.R. §§ 1508.11, 1502.1.[1] The agency must release its analysis

---

[1] The Council on Environmental Quality ("CEQ") first promulgated NEPA regulations in 1978. See 40 C.F.R. Part 1500 (1978). On July 16, 2020, CEQ issued a final rule promulgating new NEPA regulations. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule, 85 Fed. Reg. 43,304 (July 16, 2020). The CEQ has since revoked parts of the 2020 revision and restored much of the original language. National

to the public before concluding its decision-making process or committing resources to the project. *Id.* § 1500.1(b).

22.    If the agency is uncertain whether a proposed action may have a significant effect on the human environment, the agency may prepare an environmental assessment, or "EA." *Id.* § 1501.4(b). An EA should be a concise public document that briefly describes the proposal, examines reasonable alternatives, and considers the potential significance of environmental impacts. *Id.* § 1508.9.

23.    Whether in an EIS or EA, an agency must take a "hard look" at the direct, indirect, and cumulative environmental impacts of a proposed action. *Id.* §§ 1502.16, 1508.7–.8. Direct impacts are those that are caused by the action and occur at the same time and place. *Id.* § 1508.8(a). Indirect impacts also are caused by the action but occur later in time or are farther removed in distance. *Id.* § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions, both federal and non-federal. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

24.    In determining whether a proposed action may have a "significant" environmental effect, an agency must consider its context and intensity. 40 C.F.R. §§ 1508.8, 1508.27. An action's "intensity" depends on several factors, including impacts that may be both beneficial and adverse; the unique characteristics of the relevant geographic area; the degree to which the

---

Environmental Policy Act Implementing Regulations Revisions; Final Rule, 87 Fed. Reg. 23,453 (April 20, 2022) (to be codified at 40 C.F.R. §§ 1502, 1507, 1508). Because development of the Big Weekly Elk Project began before the effective date of the CEQ's 2020 revisions and project documents cite the pre-2020 version, the analysis was carried out pursuant to the 1978 regulations. Unless otherwise noted, references to the CEQ NEPA regulations will be to the 1978 version under which the Project was developed.

environmental effects are likely to be highly controversial; the degree to which the environmental effects are highly uncertain or involve unique or unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and whether the action threatens to violate federal, state, or local law or requirements imposed for the protection of the environment. *Id.* § 1508.27(b).

25.     NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. To determine which aspects may require analysis, an agency should look to the considerations and values expressed in the substantive statute driving or enabling the proposed action. If a particular resource value is addressed by the substantive statute, it is relevant to the analysis and must be duly considered by the agency.

26.     If the agency concludes that the action may have a significant impact, it must prepare an EIS. If the agency does not prepare an EIS, it must undertake a thorough environmental analysis and supply a convincing statement of reasons explaining why the project's impacts will not be significant.

27.     The CEQ regulations encourage agencies to "tier" their NEPA documents to eliminate repetitive discussions of the same issues. 40 C.F.R. § 1502.20. After a programmatic analysis is completed, a subsequent environmental review may incorporate the earlier analysis by reference and "concentrate on the issues specific to the subsequent action." *Id.*

28.     Courts view tiered analyses as a whole when determining whether they adequately address all impacts and may reject the subsequent NEPA analysis if a significant issue is not fully considered in either document. An agency must conduct a site-specific analysis of the

proposed action and its effects—a general overview of possible effects over a broad planning area is insufficiently detailed at the project level.

29.     After conducting a full NEPA analysis of a project, the BLM may sometimes approve an implementing action pursuant to a Determination of NEPA Adequacy ("DNA"). DNAs are not themselves NEPA documents. As described in the BLM's NEPA Handbook, DNAs may be used to confirm that an action is adequately analyzed in an existing NEPA document and conforms to the approved land use plan. DNAs do not contain the environmental analysis required by NEPA.

30.     The BLM stated that there are four appropriate uses for DNAs: (1) when there is a new proposed action that is similar to a previous action that was already fully analyzed in a NEPA document, (2) when there is a new proposed action that is a part of a broader action that was already fully analyzed in a NEPA document, (3) when the original NEPA analysis is old and the agency needs to determine whether new analysis is needed due to new information or changed circumstances, and (4) when there is new information not considered in existing NEPA analysis and the agency needs to determine whether that new information warrants new analysis.

31.     A DNA cannot compensate for an earlier, inadequate NEPA document.

**Endangered Species Act**

32.     Congress enacted the Endangered Species Act to declare that various "species of fish, wildlife and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). It directs that all "Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of the [Act]." *Id*. § 1531(c)(1).

33.     The ESA prohibits the "take" of listed species. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §

17.31(a). Under the ESA, "the term 'take' means to harass, harm, pursue, hunt, shoot, wound,

kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).

34.     Only following consultation with the relevant Secretary under Section 7 of the ESA—and

pursuant to an Incidental Take Statement—may a federal agency authorize an action that will

"take" a listed species. 16 U.S.C. § 1536(a)(2) & (b)(4).

35.     The BLM's 2016 Northwestern and Coastal Oregon RMP covering the Big Weekly Elk

Project area prohibits the "take" of northern spotted owls, and the relevant Biological Opinion

resulting from Section 7 consultation with the U.S. Fish and Wildlife Service states that

incidental take of northern spotted owls is not anticipated for the Big Weekly Elk Project.

36.     The Incidental Take Statement included with the Biological Opinion anticipates the take

of murrelet young at up to four murrelet sites as a result of the Big Weekly Elk Project.

**Federal Land Policy and Management Act**

37.     Congress enacted the Federal Land Policy and Management Act ("FLPMA") to ensure

that our public lands are "managed in a manner that will protect the quality of scientific, scenic,

historical, environmental, air and atmospheric, water resource and archeological values." 43

U.S.C. § 1701(a)(8). FLPMA requires that all BLM lands be managed for multiple uses and to

protect a wide range of natural resource values. *See, e.g.,* 43 U.S.C. § 1701; *see generally id.* §§

1701 – 1782.

38.     To achieve these goals, FLPMA requires the development of Resource Management

Plans ("RMP") that govern the use of BLM-administered land. 43 U.S.C. § 1712. Pursuant to 43

U.S.C. § 1732(a) and its implementing regulation, 43 C.F.R. § 1610.5-3(a), BLM must ensure

that a site-specific project conforms to the RMP including any alterations or amendments thereto.

39.     The BLM developed the Big Weekly Elk Project under the 2016 Northwestern and

Coastal Oregon Record of Decision and Resource Management Plan.

## FACTUAL BACKGROUND

### Marbled Murrelets

39.     Marbled murrelets are small sea birds found along the northwest coast of North America.

While they spend most of their lives at sea, murrelets fly inland up to 50 miles during the spring

and summer months to nest in mature and old-growth forests.

40.     Unlike other birds, murrelets do not build nests in trees, but instead lay their eggs on

thick, flat branches that are naturally covered with moss. These are known as "platforms." The

presence of these platforms is the most important characteristic of their nesting habitat.

41.     Generally, only very large, old trees contain suitable platforms. Therefore, murrelet

nesting sites are closely associated with mature and old-growth forests.

42.     During the nesting season, marbled murrelet feathers are cryptically colored in browns

and whites to blend into the forest environment, making them difficult to spot while inland. The

female lays one egg and the male and female incubate the egg in shifts while the other bird feeds

in the ocean. The egg is usually incubated for 30 days, and fledging takes 28 days. Typically, the

male and female switch incubation shifts at dawn or dusk to avoid detection by predators.

43.     Murrelets have high "site fidelity," meaning they return again and again to nest in the

same forest stand and often the same tree. This fidelity is consistent throughout the species'

range.

44.     To successfully reproduce, murrelets need large, unfragmented blocks of mature forest

habitat. These large blocks of forest protect murrelet nest sites from weather, windthrow,

microclimate effects, and most importantly predators. Marbled murrelet nest sites are negatively

associated with increasing amounts of forest fragmentation caused by logging and logging-related activities.

45.    Openings created by harvest can also influence the microclimate along the edges of remaining stands. This reduces moisture and increases temperature variability, which results in a loss of moss cover at nest sites, thereby indirectly eliminating the function of the platform for marbled murrelet nesting. Generally, microclimate effects can reach roughly 300 feet into old growth forests bordering clearcuts, roads, or similar sharp-gradient boundaries.

46.    Much of the murrelet's older forest nesting habitat in Oregon was removed by wildfire and industrial logging in the last century.

47.    Logging and logging-related activities including road construction, landing construction, and yarding corridors, can harm murrelets not only by directly removing nesting sites and nesting trees, but also by fragmenting the landscape and degrading remaining habitat patches by exposing these nesting areas to threats. Generally, logging in or adjacent to murrelet habitat will result in the impairment of essential behaviors and result in fewer nesting attempts, failure to breed, lower nest abundance, reduced breeding population, lower nest success, and a lower rate of survival in adults.

48.    In addition to direct habitat removal, logging and its related activities reduce the amount and heterogeneous nature of habitat, reduce forest patch sizes relied upon for breeding, reduce the amount of interior or core habitat that insulates nesting areas, increase the amount of forest edge where predator densities are higher, isolate remaining habitat patches, and create "sink" habitats where breeding efforts are doomed from the outset. The ecological consequences of these habitat changes to murrelets can include significant disruption of population viability and

size, local, or regional extinctions, displacement, fewer nesting attempts, failure to breed,

reduced fecundity, reduced nest abundance, and lower nest success.

49.     Because of their strong site fidelity, murrelets do not relocate or nest elsewhere when

nesting sites are lost or degraded.

50.     In 1992, the U.S. Fish and Wildlife Service ("FWS") listed murrelets as a "threatened"

species under the Endangered Species Act ("ESA"), explaining, "[t]he principal factor affecting

the marbled murrelet in [Oregon, Washington, and California], and the main cause of population

decline has been the loss of older forests and associated nest sites." 16 U.S.C. § 1533(a);

*Determination of Threatened Status for the Washington, Oregon, and California Population of*

*the Marbled Murrelet*, 57 Fed. Reg. 45,328, 45,330 (Oct. 1, 1992) (codified at 50 C.F.R. §

17.11(h)); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1062 (9th Cir. 1996) (loss of

nesting habitat has been "[t]he most significant factor in [murrelets'] decline"). In 2010, FWS

reaffirmed that murrelets "continue to be subject to a broad range of threats, such as nesting

habitat loss, habitat fragmentation, and predation."

51.     In July of 2021, the marbled murrelet was reclassified as endangered under the Oregon

Endangered Species Act.

### Northern Spotted Owl

52.     The northern spotted owl ("NSO") is a medium-sized, dark brown owl with a barred tail,

white spots on the head and breast, and dark brown eyes surrounded by prominent facial discs.

The NSO occupies late-successional and old-growth forest habitat from southern British

Columbia through Washington, Oregon, and California as far south as Marin County.

53.     Spotted owls rely on older, mature, and complex forest habitats because they generally

contain the structures and characteristics required for the owl's essential biological functions of

nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

54.     Due to concerns over widespread habitat loss and modification, as well as the lack of regulatory mechanisms to protect the species, the FWS listed the NSO as "threatened" under the ESA on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted* Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

55.     Commercial logging can remove or degrade NSO habitat. Generally, an individual spotted owl nesting spot will require a certain amount of intact, mature forest around that nest site to be considered viable. If a logging project degrades or removes functional habitat below these thresholds, it harms the species by compromising the viability of that nesting site.

56.     Logging spotted owl habitat also increases the competitive advantage of the barred owl. Barred owls are generalist predators; therefore, they can occupy habitat in much higher densities than spotted owls. This "packing effect" negatively impacts the food supply of spotted owls. This competition for food, as well as the aggressive nature of barred owls, can lead to spotted owls leaving suitable habitat areas due to the presence of barred owls.

### The 2016 RMP

57.     The 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("2016 RMP") provides overall direction for the management of all resources

on approximately 1.3 million acres of BLM-administered lands, including the Big Weekly Elk

project area. Resources that the 2016 RMP directs the BLM to manage for include ESA-listed

species and their habitat, BLM-designated sensitive species, soil health and productivity, water

quality, and carbon sequestration, among others.

58.     The overall purpose of the 2016 RMP is, in relevant part, to provide a sustained yield of

timber, contribute to the conservation and recovery of threatened and endangered species,

provide clean water in watersheds, and restore fire-adapted ecosystems. The 2016 RMP provides

this direction through different designated land use allocations that have different management

objectives and management directions. The management directions in the 2016 RMP identify

what future actions may or may not be allowed within the different land use allocations.

59.     The 2016 RMP divides BLM-administered land between five specific land use

allocations: Congressionally Reserved Lands and National Conservation Lands, District-

Designated Reserves, Late-Successional Reserves ("LSRs"), Riparian Reserves, and Harvest

Land Base ("HLB"). Each allocation's management directions identify which future actions may

or may not be allowed within a particular area.

60.     The Big Weekly Elk project area consists of 65% LSRs, 22% HLB, and 10% Riparian

Reserves.

61.     Late-Successional Reserves were created to protect and promote the development of

mature forests. The BLM's primary management objectives for LSRs is to maintain nesting-

roosting habitat for the NSO and nesting habitat for the marbled murrelet.

62.     To achieve this objective, the BLM is required by the 2016 RMP to limit its actions

within LSRs to those that do not preclude or delay development of northern spotted owl nesting-

roosting habitat by 20 years or more.

63.    Additionally, the BLM is prohibited under the 2016 RMP from authorizing or undertaking activities that compromise marbled murrelet nesting opportunities or disrupt marbled murrelet nesting at occupied sites. This standard applies when the BLM is conducting activities within all land use allocations within 35 miles of the Pacific Coast and when conducting activities within reserved land use allocations between 35-50 miles of the Pacific Coast.

64.    Management directives specific to the HLB include conducting silvicultural treatments to enhance timber values and reduce fire risk; restoring and maintaining habitat for sensitive species; providing complex early-seral ecosystems; promoting the development of structural complexity; meeting snag retention and creation levels; and retaining large trees.

65.    The BLM's primary management objective for Riparian Reserves is to contribute to the conservation and recovery of ESA-listed fish species and their habitats; maintain and restore natural channel dynamics, processes, and the proper functioning condition of riparian areas; and maintain water quality and streamflow to protect aquatic biodiversity and to provide quality water for recreation and drinking water sources. The BLM is required to follow its management direction within the 2016 RMP and allowable use restrictions for Riparian Reserves, including using site-specific Best Management Practices to maintain water quality during land management actions.

66.    The BLM is required to demonstrate how any project developed under the 2016 RMP will follow relevant management directions to achieve the 2016 RMP's objectives. This includes site-specific analyses of landscape characteristics—including wildlife populations, snags, stand density and conditions, tree diameter and age, invasive species infestations, extent of detrimental

soil disturbance, water quality, and availability of wildlife habitat—to ensure compliance with the 2016 RMP's substantive standards and guidelines.

**Management Objectives for Marbled Murrelets in the 2016 RMP**

67.     Within LSRs and within 35 miles of the coast, the 2016 RMP states that "before modifying nesting habitat or removing nesting structure, [the BLM is required to] assess the analysis area for marbled murrelet nesting structure." The analysis area consists of the proposed project and lands within 726 feet of the project boundary. The analysis area includes all nesting structures that could be affected by habitat modification.

68.     If there is a nesting structure, the BLM must implement one of three options from the 2016 RMP.

69.     Option 1 involves surveying for murrelets, and if occupancy is determined, no activities may be conducted within the occupied stand as well as within 300 feet of the occupied stand. "Occupied stand" is defined as "all forest stands, regardless of age or structure, within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy and not separated from the location of marbled murrelet behavior indicating occupancy by more than 328 feet of non-forest." There are exceptions for certain restoration activities, but the BLM must ensure that the stand continues to support nesting.

70.     Option 2 contains a required list of numerous protections for nesting structure:

>   Maintain a 150-foot un-thinned buffer around all trees with nesting structure. Within this buffer, do not remove trees for any reason associated with timber harvest, including the placement of roads, landings, or yarding corridors.

>   Maintain an average canopy cover of at least 60% post-project (averaged over each 40-acre area) in the zone between 150 feet and 300 feet of all trees with nesting structure.

>   Include additional, site-specific prescriptive measures to maintain or enhance habitat conditions, as needed, in the zone between 150 feet and 300 feet from all trees with nesting structure. In this context, 'maintaining marbled murrelet habitat' means to

maintain stand structural characteristics such that, following habitat modification, the stand could support marbled murrelet nesting.

Maintain an average canopy cover of at least 40% post-project (averaged over each 40-acre area) within the project area beyond 300 feet from all trees with nesting structure.

71.     Option 3 states that with concurrence from the FWS, the BLM is directed to manage nesting structure in a manner that would not adversely affect nesting marbled murrelets, except when taking actions that are necessary to treat or protect stands from sudden oak death.

### Big Weekly Elk Forest Management Project EA and FONSI

72.     The Big Weekly Elk ("BWE") Project area lies within the Coquille River watershed in Coos County, Oregon. It includes 29,781 acres of BLM-managed land, interspersed with private industrial timberlands, Bureau of Indian Affairs lands, and a small number of local government acres. The BWE project area is within 35 miles of the Pacific Coast.

73.     There are approximately 3,608 acres proposed for harvest within the BWE Project area. 51% are within LSRs, 36% within Riparian Reserves, and 20% within the HLB.

74.     The stated purpose for the project is to (1) speed development of northern spotted owl nesting-roosting habitat within LSRs; (2) promote the development of stable wood within Riparian Reserve inner zones; and (3) conduct timber harvest within the HLB that will contribute to the Coos Bay District's Allowable Sale Quantity ("ASQ") volume and adjust the age class distribution at the Sustained Yield Unit scale.

75.     Cascadia timely submitted scoping comments on the BWE Project proposal on July 8, 2019.

76.     The BLM issued a preliminary draft Environmental Assessment ("EA") for the BWE Project on July 21, 2021.

77.    Cascadia timely submitted scoping comments on the draft EA on August 27, 2021. These comments raised a number of issues, noting, *inter alia*, that the BWE Project would have significant impacts on threatened species including the marbled murrelet, wildlife habitat, water quality, soils, and wildfire hazard; that the BLM is choosing to adhere only to certain provisions of the RMP that promote logging and commercial timber volume, while ignoring other RMP protections and guidance; that the BLM did not fully disclose or assess any site-specific impacts of associated timber sales; and that given the scope, scale, and potentially significant impacts of the project, the BLM should prepare an EIS to fully analyze and disclose the project's potential impacts.

78.    The BLM issued a final EA and Finding of No Specific Impact ("FONSI") for the BWE Project on November 4, 2021.

79.    In the final EA, the BLM analyzed only nine issues in detail, three of which focused on commercial timber concerns.

80.    Further, the EA purported to fully analyze just two wildlife issues: how proposed treatments in LSRs and Riparian Reserves would affect NSO habitat, and how vegetation modification would affect known NSO nests in the project area.

81.    The EA did not analyze in detail the BWE Project's impacts to marbled murrelets or its habitat.

82.    The EA relegated the following key topics to Appendix A for mere cursory discussion: Areas of Critical Environmental Concern, Port Orford cedar, botanical species, fungi species, carbon emissions and storage, cultural resources, economics, sediment delivery, peak flows, fire hazard, visual resources, recreation, public access and safety, soils, invasive plants, NSO and marbled murrelet critical habitat, noise/smoke disturbance, murrelet nesting habitat, murrelet

occupied sites, competition between NSO and barred owls, NSO dispersal, NSO use of the HLB for habitat, and coastal marten habitat.

83.    The BLM said it eliminated the BWE Project's impacts on carbon emissions and storage from detailed analysis "because the issue is not related to the project's purpose and need, and there would be no reasonably foreseeable significant effects of the proposed action . . . ."

84.    Similarly, the BLM asserted that it eliminated the BWE Project's impacts on peak flows from detailed analysis "because the issue is not related to the project's purpose and need, and because detailed analysis is not necessary to determine the significance of impacts."

85.    The BLM said it eliminated soils from detailed analysis because the BWE Project "EA tiers to [the 2016 RMP], which provides management direction" regarding soils.

86.    The BLM said it eliminated detailed analysis of effects on NSO and marbled murrelet critical habitat, murrelet nesting habitat and structures, special status wildlife species, bald and golden eagles, and migratory birds from detailed analysis "because [the issues do] not address the purpose and need and [are] not associated with significant impacts beyond those analyzed in the [2016 RMP EIS] to which the [BWE Project EA] tiers."

87.    The BLM said it eliminated detailed analysis of effects on murrelet occupied sites, competition between NSO and barred owls, NSO dispersement, and how HLB logging impacts the NSO's ability to utilize habitat for nesting or roosting-foraging because it analyzed those issues "in the [2016 RMP EIS] to which [the BWE Project EA] tiers."

88.    The BWE Project EA analyzed a "no action" alternative and two action alternatives that differ only in whether new road construction would be authorized. Under both alternatives, the BLM would authorize regeneration logging, colloquially known as "clearcutting," and commercial

thinning within the HLB. The proposed logging will occur in mature and old-growth forest including stands 80 years or older.

89.    Nearly 400 acres of NSO habitat will be removed or have reduced function as a result of the BWE Project. The BWE Project would also remove or downgrade 75 acres of NRF habitat and 142 acres of roosting-foraging habitat.

90.    The FWS noted that the project may result in LSRs becoming unavailable to NSO for decades, and that the project is "likely to negatively influence the long-term population viability of northern spotted owls in the action area."

91.    Additionally, the BLM is proposing to log areas that contain marbled murrelet nesting habitat, as well as buffer areas around this nesting habitat. Under the project, road and landing construction and yarding corridors will also occur within marbled murrelet nesting habitat and/or the buffers around this habitat.

92.    The FWS determined that the BWE Project would adversely impact nesting murrelets, including at 40 occupied murrelet sites.

93.    The FWS determined that the adverse impacts to nesting murrelets were the result of the BLM's failure to apply buffers to nesting habitat. The absence of buffer habitat to adjacent nesting habitat will likely result in strong edge effects that will affect the adjacent habitat's ability to support nesting. This will also negatively affect reproductive success due to changes in microsite conditions and increased risk of predation.

94.    The FWS also determined that the thinning activities proposed by the BLM could have adverse effects on nesting as well. The agency admits that there is a paucity of information describing impacts of variable thinning adjacent to known occupied habitat, but it concludes that the logging will result in a significant change in stand conditions, the creation of openings, a

reduction in screening cover, and states that adverse impacts from microsite changes and potential increases in predation to adjacent nesting habitat may occur.

95.    The BLM's proposed action will not apply 300-foot buffers to occupied marbled murrelet habitat as contemplated by the 2016 RMP in regard to proposed thinning. The BLM instead proposes to apply a 150-foot buffer around occupied habitat, but only in areas where the proposed harvest unit is greater than 70 years old. In forests 60 years or younger, BLM will only buffer individual murrelet trees.

96.    While the buffers may reduce adverse impacts associated with logging, adverse impacts to murrelet nesting are still possible and anticipated. The proposed individual tree protection will not benefit or protect nesting murrelets at all.

97.    Additionally, the BLM is proposing road construction and yarding corridors within this 150-foot buffer. These activities could fell potential nest trees and adverse impacts from these activities are likely to be most pronounced due to the combination of road construction and thinning in close proximity to trees that could be used for nesting.

98.    The BLM estimates that 350 acres of occupied suitable marbled murrelet habitat occurs within 150 feet of proposed thinning.

99.    HLB treatments will remove about 229 acres of suitable murrelet habitat.

100.    While occupied habitat is not proposed for removal, some of the treatment areas in the HLB occur immediately adjacent to previously delineated occupied stands.

101.    This removal of adjacent habitat will further fragment the landscape of the Oregon Coast Range and will preclude habitat development for generations.

102.    Commercial and non-commercial thinning in Riparian Reserves will affect an additional 25 acres of marbled murrelet habitat.

103.    The BLM issued the Brownson Falls Determination of NEPA Adequacy ("DNA") on May 10, 2023.

104.    The Brownson Falls DNA shows that proposed logging is bordering occupied murrelet habitat. There will also be extensive logging and road landing construction directly adjacent to, and potentially within, stands occupied by marbled murrelets.

105.    In the BWE Project FONSI, the BLM asserted that there are no "other actions related to the action alternatives with individually insignificant but cumulatively significant impacts."

106.    Through the NEPA process, Cascadia pointed out that the BWE Project EA failed to address two nearby BLM timber sales, the Catching and Upper Rock Creek projects. These projects have cumulative impacts with the BWE Project on individual NSO sites and other resources and values, including marbled murrelets and carbon storage and emissions.

107.    The Catching Project authorized 841 acres of regeneration harvest, while the Upper Rock Creek Project authorized 1,108 acres of regeneration harvest.

108.    Additionally, neither the EA nor the FONSI for the BWE Project mention the Coos Bay LSR Landscape Plan. The BWE Project area overlaps with the Coos Bay LSR Landscape Plan's project area. BLM released a scoping notice for the Coos Bay LSR Landscape Plan four months before it released the BWE Project Final EA and FONSI.

109.    There will be several forest management actions in the same area that overlap in time and that will together result in a significant loss of suitable NSO habitat and other significant impacts on NSO, marbled murrelets, carbon storage and emissions, and other resources and values.

**Executive Orders 13990 and 14072**

110.    On January 20, 2021, shortly after taking office, President Biden issued Executive Order 13990), *Protecting Public Health and the Environment and Restoring Science to Tackle the*

*Climate Crisis*, which stated that "[i]t is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." *See* 86 Fed. Reg. 7,037, Sec. 5 (Jan. 20, 2021).

111.    Further, Executive Order 13990 stated that calculating and disclosing "[a]n accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions." *Id.*

112.    An Interagency Working Group issued a Technical Support Document with interim estimates of the social cost of carbon in February of 2021 pursuant to Executive Order 13990.

113.    On Earth Day of 2022, President Biden issued Executive Order 14072, *Strengthening the Nation's Forests, Communities, and Local Economies*, which emphasized the importance of mature and old-growth forests on Federal lands for the health, prosperity, and resilience of communities. *See* 87 Fed. Reg. 24,851, Sec. 1 (April 22, 2022).

114.    Executive Order 14072 stated the Biden Administration's policy "to conserve America's mature and old-growth forests on federal lands." *Id.*

115.    Executive Order 14072 said the Biden Administration "will manage forests on Federal lands, which include many mature and old-growth forests, to promote their continued health and resilience; retain and enhance carbon storage; conserve biodiversity; mitigate the risk of wildfires; enhance climate resilience; enable subsistence and cultural uses; provide outdoor recreational opportunities; and promote sustainable local economic development." 87 Fed. Reg. at 24,852, Sec. 2.

116.    To conserve mature and old-growth forests, Executive Order 14072 directed the Secretaries of Agriculture and the Interior to, within one year, "define, identify, and complete an

inventory of old-growth and mature forests on Federal lands, accounting for regional and ecological variations, as appropriate, and shall make such inventory publicly available." 87 Fed. Reg. at 24,852, Sec. 2.

117.    In April of 2023, the Secretaries released working definitions and an inventory for mature and old-growth forests, along with a coarse mapping tool.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(Federal Land Policy and Management Act Compliance)**

118.    Cascadia realleges and incorporates by reference all preceding paragraphs.

119.    Pursuant to FLPMA, 43 U.S.C. § 1732(a), and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM has a duty to ensure that a site-specific project conforms to and is consistent with the governing Resource Management Plan. The BWE Project is governed by the 2016 RMP.

120.    The 2016 RMP requires the BLM to maintain murrelet nesting habitat and ensure that any logging activities support continued murrelet nesting.

121.    The 2016 RMP allows the BLM to select from three options to meet these murrelet objectives.

122.    The BLM is purportedly implementing Option 1 for the BWE Project.

123.    Option 1 states that if marbled murrelet occupancy is determined, the BLM cannot conduct activities within the occupied stand and all forest within 300 feet of the occupied stand.

124.    The BWE Project will not buffer occupied stands by 300 feet. The project will remove and degrade habitat within this 300-foot buffer. The HLB logging proposed within the BWE Project will not buffer occupied murrelet habitat.

125.    Within the LSR areas proposed for logging, the BWE Project will buffer occupied habitat by 150 feet instead of the 300 feet required by the 2016 RMP. The BLM is proposing to log

extensively within buffers to occupied murrelet habitat. Further, the BWE Project's proposed

road construction, landing construction, and yarding corridors to facilitate this commercial

thinning will occur within this 150-foot buffer.

126.     The BWE Project will adversely affect occupied murrelet habitat. The BWE Project will

adversely affect murrelet nesting. The BLM has not ensured that its activities will support

continued murrelet nesting. The BLM is openly violating the 2016 RMP's marbled murrelet

management directions.

127.     The BLM's failure to develop a project in accordance with relevant RMP direction is

arbitrary and capricious in violation of FLPMA. 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**
**(Violations of the National Environmental Policy Act)**

**Count One – Failure to Prepare an Environmental Impact Statement**

128.      Cascadia realleges and incorporates by reference all preceding paragraphs.

129.     Federal agencies are required to prepare an EIS when "substantial questions" are raised

as to whether a major federal action "may" cause significant degradation of some human

environmental factor. 42 U.S.C. § 4332(C).

130.     An agency's decision not to prepare an EIS must be fully-informed and well-considered,

supported by a convincing statement of reasons why the action's effects will not be significant.

131.     In deciding whether an action may have a significant impact, the agency must consider

the context and intensity of the proposed project. 40 C.F.R. § 1508.27. CEQ regulations specify

ten factors the agency must consider when assessing a project's intensity. 40 C.F.R. §

1508.27(b).

132.     The agency's statement of reasons must show that none of the intensity factors are

present. The significance of one individual factor, or of multiple factors in combination, may

require preparation of an EIS. The BWE Project implicates numerous intensity factors that individually and cumulatively compel the preparation of an EIS. The intensity factors relevant here are: the degree to which possible effects are highly uncertain, the degree to which effects are likely to be highly controversial, the unique characteristics of the project area, the degree of adverse effects on ESA-listed species and critical habitat, the likelihood of cumulative effects being significant, and that the action threatens a violation of an environmental protection law.

133.    The BWE Project will have highly uncertain effects on the NSO. It is uncertain whether proposed treatments will exacerbate barred owl impacts on NSO, how NSO will respond to the thinning treatments, and how many undetected NSO are within the project area.

134.    Logging authorized in NSO habitat and LSRs will result in effects that are highly controversial. These effects include impacts on carbon sequestration and greenhouse gas emissions, NSO habitat, fire resilience and habitat development after thinning, and forest resilience to climate change.

135.    The BWE Project will affect areas with unique characteristics, including mature and old-growth forests that provide habitat for ESA-listed species and other special status wildlife species. The FONSI ignores that the project area includes LSRs and Riparian Reserves, which are "ecologically critical areas" for listed species and provide NSO and marbled murrelet critical habitat.

136.    The BWE Project is likely to affect ESA-listed species significantly and adversely, specifically the NSO and marbled murrelet, and possibly the coastal marten. Almost 400 acres of high quality NSO habitat will be removed or have reduced function. Eight spotted owl sites would be directly affected by the project since logging units are within their home ranges, nest cores, and/or nest patches. The Coos Bay Landscape, Catching, and Upper Rock Creek projects

will have cumulatively significant and adverse impacts on NSO along with the BWE Project. The BWE Project also intersects 55 identified occupied murrelet sites and 225 acres of that species' critical habitat, and the coastal marten also may be present in the project area since it is located within their historic range.

137.    The BWE Project threatens to violate federal law, specifically FLPMA. The BLM will violate the 2016 RMP in regard to the marbled murrelet. The 2016 RMP requires the BLM to manage habitat for ESA-listed species "consistent with recovery plans, conservation agreements, and designated critical habitat." The RMP also requires the BLM to "assess the analysis area for marbled murrelet nesting structure" before modifying nesting habitat or removing nesting structure. The RMP also requires the BLM to maintain nesting habitat for the marbled murrelet, to ensure that any logging activities support continued murrelet nesting, and to protect stands of older, structurally complex conifer forest in LSRs. BLM is violating murrelet management direction Option 1 that it is purporting to follow. The project as authorized openly violates RMP requirements.

138.    The intensity factors implicated by the BWE Project are significant individually and when considered cumulatively. The BWE Project EA simply does not contain adequate support for the BLM's conclusion the Project will have no significant impacts.

139.    A FONSI must "provide[] a convincing statement of reasons to explain why a project's impacts are insignificant." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020). The BLM's FONSI for the BWE Project does not satisfy this requirement. The BWE Project may significantly impact the environment, warranting preparation of an EIS.

140.    The BLM's decision to authorize the BWE Project without first preparing an EIS violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count Two – Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts**

141.    Cascadia realleges and incorporates by reference all preceding paragraphs.

142.    An EA must provide sufficient evidence and analysis, including disclosure and consideration of the environmental impacts of a proposed action and alternatives, to determine whether to prepare an EIS or a FONSI.

143.    The agency must disclose, analyze, and consider the direct, indirect, and cumulative effects of a proposed action.

144.    To take the required "hard look" at a project's effects, an agency may not rely on incorrect assumptions or data. The information must be of high quality. Accurate scientific analyses, expert agency comments, and public scrutiny are essential to implementing NEPA.

145.    A project's purpose and need statement does not dictate the required scope of NEPA review. Rather, an agency's substantive statutory responsibilities inform the issues that must be considered in a NEPA analysis.

146.    The BWE EA states it is intended to implement FLPMA vis-à-vis the management directives included in the 2016 RMP, among other statutes. FLPMA, as implemented through the 2016 RMP, instructs the BLM to manage for ESA-listed species and their habitat, Bureau sensitive species, soil health and productivity, water quality, and carbon sequestration.

147.    All these values are relevant to the agency's NEPA analysis of the BWE Project, but the BLM improperly dismissed carbon emissions and storage, peak stream flows, NSO and marbled murrelet critical habitat, special status species and eagle, murrelet nesting habitat, and murrelet

occupied sites from detailed review, asserting such issues do not relate to the project's purpose and need.

148.    A site-specific EA may only tier to a programmatic NEPA analysis when that programmatic document included site-specific analysis. The BLM's EA for the BWE Project improperly tiered to the 2016 RMP EIS for analysis on carbon storage and emissions, soils, critical habitat for NSOs and marbled murrelets, marbled murrelet nesting sites and structures, marbled murrelet occupied sites, competition between barred owls and northern spotted owls, and northern spotted owls within the Harvest Land Base. The 2016 RMP EIS did not include analysis of the BWE Project's site-specific impacts on these resources and values.

149.    Without such site-specific analysis, the BLM lacked the requisite basis for determining the significance of the BWE Project's impacts on these resources and values. The agency's conclusion that there would be no significant impacts was arbitrary and baseless.

150.    The BLM failed to disclose, analyze, consider, and otherwise take a hard look at the BWE Project's direct, indirect, and cumulative impacts on, *inter alia*, soils, marbled murrelets and their critical habitat, NSOs and their critical habitat, special status species and eagles, and carbon storage and emissions.

151.    The BLM failed to take a hard look at cumulative impacts to NSOs, marbled murrelets, carbon storage and emissions, and other environmental values from the BWE Project along with the nearby Catching, Upper Rock Creek, Coos Bay Landscape, and other logging projects.

152.    The BLM failed to utilize available tools and information to take a site-specific hard look at the impacts of the BWE Project on carbon storage and emissions, including the social cost of carbon, and further failed to update its analysis and consideration of alternatives in light of Executive Order 14072, which states the current presidential administration's policy to conserve

mature and old-growth forests on federal lands, in part for their ability to absorb and store carbon from the atmosphere.

153.    The BLM's failure to sufficiently disclose, analyze, and consider the direct, indirect, and cumulative impacts of the BWE Project violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

Plaintiffs Cascadia Wildlands and Oregon Wild respectfully request that this Court:

a.  Adjudge and declare that Defendant's approval of the Big Weekly Elk Project and its implementing DNAs violates FLPMA and its implementing regulations, and thus is arbitrary, capricious, an abuse of discretion, and contrary to law;

b.  Adjudge and declare that Defendant's approval of the Big Weekly Elk Project and its implementing DNAs violates NEPA and its implementing regulations, and thus is arbitrary, capricious, an abuse of discretion, and contrary to law;

c.  Hold unlawful and set aside the FONSI and EA for the Big Weekly Elk Project and any associated DNA, and order Defendant to withdraw the FONSI, EA, DNAs, and any associated contracts until such time as Defendant demonstrates it has complied with the law;

d.  Enjoin Defendant and its contractors, assigns, and other agents from proceeding with commercial logging prescriptions and associated road construction unless and until the violations of federal law set forth herein have been corrected;

e.  Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

f.   Award Plaintiffs their costs of suit, reasonable expenses, and attorney fees pursuant to the

Equal Access to Justice Act, 28 U.S.C. § 2412.

g.   Grant such further relief as the Court deems just, proper, and equitable.

Respectfully submitted this 19th day of September, 2023.

John S. Persell
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

Nicholas S. Cady
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434-1463
nick@cascwild.org