IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS, an Oregon
non-profit corporation; and
OREGON WILD, an Oregon non-profit
Corporation,

       Plaintiffs,

             v.

UNITED STATES BUREAU OF
LAND MANAGEMENT, a federal agency,

       Defendant.
_____

Case No. 6:23-cv-1358-MC

OPINION & ORDER

**MCSHANE, District Judge:**

Plaintiffs Cascadia Wildlands and Oregon Wild ("Plaintiffs") bring this action for declaratory and injunctive relief against Defendant Bureau of Land Management ("BLM"). Plaintiffs allege that Defendant violated the Federal Land Policy and Management Act ("FLPMA") and National Environmental Policy Act ("NEPA") in approving the Big Weekly Elk Forest Management Project ("BWE Project") and associated timber sale decisions. Pls.' Am. Compl. ¶ 1, ECF No. 9. Pending before the Court are cross motions for summary judgment. ECF Nos. 16, 23. Because BLM complied with the FLPMA and took a "hard look" at the

1 – OPINION & ORDER

environmental impacts of the Project, Defendant's Cross-Motion for Summary Judgement (ECF No. 23) is GRANTED and Plaintiffs' Motion for Summary Judgment (ECF No. 16) is DENIED.

I.  BACKGROUND

The challenged BWE Project Environmental Assessment ("EA") is tiered to the Environmental Impact Statement ("EIS") for the 2016 Northwestern and Coastal Oregon Resource Management Plan ("2016 RMP").[1] A.R. 466; 4802. The 2016 RMP provides management direction for approximately 1.3 million acres of BLM lands in the Coos Bay District, Eugene District, Salem District, and the Swiftwater Field Office of the Roseburg District. A.R. 10807. Its purpose is to provide a sustained yield of timber, contribute to the conservation and recovery of threatened and endangered species, provide clean water in watersheds, restore fire-adapted ecosystems, promote recreational activities, and coordinate management of lands surrounding the Coquille Forest with the federally recognized Coquille Tribe.[2] A.R. 10831–32.

In contrast, lands classified as "timberlands" under the Oregon & California Revested Lands Act ("O&C Act") are to be managed for permanent forest production in accordance with the principle of "sustainable yield" to provide a permanent source of timber supply, protect watersheds, regulate stream flow, and contribute to the economic stability of local communities and industries. 43 U.S.C. § 2601. In sum, "the [O&C Act] directs [BLM] to determine which

---

[1] The development of an RMP "is considered a major Federal action significantly affecting the quality of the human environment" requiring the preparation of an EIS under NEPA. 43 C.F.R. § 1601.0–6. The Ninth Circuit has upheld the EIS for the 2016 RMP as legally sufficient under NEPA. *See Pac. Rivers v. Bureau of Land Mgmt.*, 815 F. App'x 107, 110 (9th Cir. 2020).
[2] In developing the 2016 RMP, BLM consulted with the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service under the Endangered Species Act ("ESA") to analyze the potential environmental effects of management under the proposed RMP. A.R. 10846–50. Each agency issued a biological opinion concluding that the proposed RMP was not likely to jeopardize the continued existence of any of the species under its jurisdiction. A.R. 10848–50.

portions of the land should be set aside for logging and which should be reserved." *Murphy Co. v. Biden*, 65 F.4th 1122, 1134 (9th Cir. 2023). FLPMA's multiple-use mandate does not apply to O&C lands because the O&C Act is a primary use statute for sustained-yield timber production. 43 U.S.C. § 1701(b). However, they are still subject to the procedural requirements of FLMPA, including the preparation of RMPs. *See Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, No. 1:19-cv-2069-CL, 2021 WL 4462886, at *2 (D. Or. Sept. 29, 2021).

The 2016 RMP divides BLM-administered land into multiple land use allocations with different management objectives and direction. A.R. 10854. Management objectives are "[d]escriptions of desired outcomes for BLM-administered lands and resources in an RMP[.]" A.R. 10858. Management direction "identifies where future actions may or may not be allowed and what restrictions or requirements may be placed on those future actions to achieve the objectives set for the BLM-administered lands and resources." A.R. 10858.

Lands allocated to the Harvest Land Base ("HLB") are managed for sustained yield timber harvest. A.R. 10870–74. By contrast, lands allocated to the Late-Secessional Reserve ("LSR") are managed to promote habitat for species listed under the Endangered Species Act ("ESA") including the northern spotted owl ("NSO") and marbled murrelet. A.R. 10875–78. Finally, lands allocated to the Riparian Reserve ("RR") are managed to protect water quality and endangered fish. A.R. 10879–85.

The BWE Forest Management EA analyzed the effects of timber harvest on up to 3,155 acres of BLM land, including 1,828 acres of thinning in the LSR and 727 acres of regeneration harvest in the HLB. A.R. 486. The entire Project area lies within twenty-eight miles of the Pacific Ocean. A.R. 2088. Timber harvested in HLB areas is designed to contribute to the annual

timber volume for the Coos Bay District while thinning in LSR areas is designed to improve habitat for northern spotted owls and marbled murrelets. A.R. 470–73.

After receiving timely comments from Plaintiffs and other interested parties, BLM issued the final EA and Finding of No Significant Impact ("FONSI") in October 2021. A.R. 464. The final EA analyzed a "no action" alternative as well as two action alternatives that differed primarily in whether new road construction would be authorized.[3] A.R. 474–86. Since issuing the final EA and FONSI, BLM has begun implementing the BWE Project through a series of timber sales that will take place over the course of five years. A.R. 479–85. Actively planned and authorized timber sales include the Brownson Falls, Elk Creek Ridge, Jones and Elk, and Sugar Rush timber sales. *See* A.R. 53; 67; 318; 399. Plaintiffs now challenge BLM's approval of the BWE Project EA, FONSI, and associated timber sale decisions.

## II.   STANDARD OF REVIEW

A federal agency's compliance with FLPMA and NEPA is reviewed under the Administrative Procedure Act ("APA"). *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1124–25 (9th Cir. 2007). A reviewing court must set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 462 U.S. 29, 43

---

[3] BLM also considered but did not analyze in detail three additional alternatives: (1) "no regeneration harvest;" (2) "treat all LSR and RR acres non-commercially;" and (3) "treat all LSR and RR acres commercially." A.R. 487.

4 – OPINION & ORDER

(1983). Agency action is also arbitrary and capricious if the agency failed to articulate a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

While the court's "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The APA's deferential standard "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted). Nonetheless, a court may not simply "rubber-stamp" an agency's decision as correct. *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554 (9th Cir. 2016).

The Ninth Circuit has expressly endorsed the use of summary judgment to review agency actions governed by the APA. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Where, as here, there are no facts in dispute and the parties file cross-motions for summary judgment, the court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cnty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir.1997) (citation and internal quotation marks omitted).

## III. DISCUSSION

Plaintiffs bring three claims challenging BLM's approval of the BWE Project EA, FONSI, and associated timber sales. Specifically, Plaintiffs allege that BLM acted arbitrarily, capriciously, and contrary to law by: (1) failing to conform the BWE Project to the 2016 RMP in

violation of FLPMA; (2) failing to prepare an EIS in violation of NEPA; and (3) failing to take a "hard look" at the direct, indirect, and cumulative effects in violation of NEPA. Pls.' Mot. Summ. J. 16; 24; 33, ECF No. 16. The Court addresses each argument in turn.

### A. FLPMA

As discussed above, FLPMA requires BLM to develop and implement "land use plans" to ensure that the management and development of public lands is conducted "on the basis of multiple use and sustained yield unless otherwise specified by law[.]" 43 U.S.C. §§ 1701(a)(7); 1712(c)(1). BLM refers to these land use plans as RMPs. 43 C.F.R. § 1610.4–2. RMPs are in turn "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0–2. Once finalized, all site-specific actions must conform to the governing RMP. 43 U.S.C. §1732(a); 43 C.F.R. §1601.0–5(b) (defining "conformance" as "specifically provided for in the plan" or "clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment."). Failure to comply with the provisions of an approved RMP constitutes a violation of FLPMA.

The 2016 RMP provides the following marbled murrelet management direction (the "Management Direction"):

> Before modifying nesting habitat or removing nesting structure in (1) all land use allocations within 35 miles of the Pacific Coast . . . . assess the analysis area for marbled murrelet nesting structure. The analysis area consists of the proposed project and lands within 726 feet of the project boundary. The analysis area includes all nesting structures that could be affected by habitat modification.
>
> - If the analysis area contains no nesting structure, no further consideration of marbled murrelet habitat is required.

- Before modifying forest stands in any 5-acre portion (using a 5-acre moving circle) of the analysis area that contains at least 6 trees with nesting structure, implement Option 1, 2, or 3.

Option 1: Survey for the marbled murrelet using a protocol with a defined methodology and a resultant probability of detection:

- If no occupancy is determined, no further consideration of marbled murrelet habitat is required.
- If occupancy is determined, do not conduct activities within the occupied stand and all forest within 300 feet of the occupied stand.
- The following are exceptions that may be implemented as long as the stand continues to support nesting:
    - Felling of hazard trees and trees for instream restoration projects
    - Construction of linear and nonlinear rights-of-way, spur roads, yarding corridors, or other facilities
- As needed to protect the overall health of the occupied stand, the following activities would be implemented as long as the stand continues to support nesting:
    - Wildfire suppression
    - Fuels reduction
    - Insect and disease control
    - Other activities to improve the health of the stand or adjacent stands

A.R. 10909–10 (emphasis omitted).

Plaintiffs' FLPMA claim turns largely on BLM's interpretation of what actions constitute "modifying nesting habitat" under the 2016 RMP. The RMP does not provide a definition for "modifying nesting habitat." BLM argues that only direct impacts from actions taken within the stand itself constitutes "modifying nesting habitat," which triggers a suite of additional protections for the murrelet. In contrast, Plaintiffs argue that even indirect edge effects from activities in adjacent stands qualify as "modifying nesting habitat." While Plaintiffs argue that BLM's interpretation runs counter to the plain language of the RMP and is therefore arbitrary and capricious, BLM argues that its interpretation is entitled to substantial deference. Def's Mot. Summ. J. 10–17, ECF No. 23; Pls.' Reply in Supp. of Mot. Summ. J. 2–19, ECF No. 25 ("Pls.'

7 – OPINION & ORDER

Reply"). To resolve this dispute, the Court must determine if "modifying nesting habitat," as used in the 2016 RMP, is ambiguous.

Under the doctrine of *Auer* deference, an agency's interpretation of its own regulation is entitled deference if it is "genuinely ambiguous" and falls "within the bounds of reasonable interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019) (citation omitted). Before concluding that a regulation is genuinely ambiguous, however, the reviewing court must "exhaust all of the 'traditional tools of construction'" by examining its text, context, history, and purpose. *Id.* at 2415 (quoting *Chevron U.S.A. Inc., v. Nat. Resources Defense Council, Inc.*, 467 U. S. 837, 843, n.9 (1984)); *see also Minnick v. Comm'r*, 796 F.3d 1156, 1159, (9th Cir. 2015) (per curiam) ("Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction.").

Although the term "modifying nesting habitat" is not expressly defined in the 2016 RMP, this silence alone is not sufficient to support a finding of ambiguity. *See Kisor*, 139 S. Ct. at 2406 (cautioning courts to avoid "jump[ing] the gun" to declare agency regulations ambiguous before "bring[ing] all its interpretive tools to bear on the question."). Looking beyond the four corners of the 2016 RMP to the administrative record as a whole reveals that FWS's Biological Opinion ("BiOp") for the 2016 RMP contemporaneously defined the term to include any actions "affecting adjacent stands that would modify the nesting structures['] wind firmness, microclimate[,] and/or predation risks." A.R. 12841. FWS, however, is not tasked with either implementing (or interpreting) the RMP or administering the lands in question. And, as noted above, the 2016 RMP is silent on the meaning of "modifying nesting habitat." Additionally, BLM later clarified, years before Plaintiffs filed this action, that BLM interpreted the term as

applying "only to actions that take place within the nesting habitat." A.R. 6036; 8671. When FWS "became aware of a difference in agency interpretation" of the Management Direction, it conducted a new edge effects analysis based on BLM's interpretation. A.R. 04494. Ultimately, while FWS still "recommends that BLM" provide the 300-foot buffer for all marbled murrelet sites, it "determined that either interpretation does not alter the conclusions in the jeopardy analysis conducted for the RMP." A.R. 04494.

Although the agencies disagreed on whether indirect edge effects from actions in adjacent stands resulted in "modifying nesting habitat," there is convincing evidence in the 2016 RMP that the BLM contemporaneously interpreted the phrase to apply only to direct actions taken within the impacted stand itself. Specifically, as later acknowledged by FWS, in the 2016 RMP, "BLM modeled Allowable Sale Quantity (ASQ) from the Harvest Land Base (HLB) assuming that harvest would occur up to the edge of occupied sites identified under the Northwest Forest Plan." A.R. 04494. While one purpose of the 2016 RMP was to conserve and assist the recovery of threatened and endangered species, another purpose was to "provide a sustained yield of timber." A. R. 10812. As described in the 2016 RMP:

> The ASQ volume represents the sustained-yield volume of timber that the BLM can offer for sale from each sustained-yield unit; as such, the BLM offers this sustained-yield volume of timber only from the Harvest Land Base, which has specific objectives for sustained-yield timber production.

A.R. 10817.

That the RMP's ASQ modeling and conclusion is based on BLM's interpretation that "modifying nesting habitat" refers only to direct alteration of nesting habitat, and does not

include buffers from indirect edge effects, supports the BLM's argument.[4] In contrast, accepting Plaintiffs' proffered definition of "modifying nesting habitat" would render the 2016 RMP's ASQ calculations meaningless.

The Court acknowledges that the purpose of the 2016 RMP's Management Direction, which is designed to ensure that "timber harvest will not negatively impact murrelets in any [land use areas] within 35 miles of the Pacific Coast," may appear at first glance to be consistent with Plaintiffs' more expansive definition of the term. A.R. 11765. However, the 2016 RMP consists of a complex management plan furthering numerous purposes on over one million acres of BLM administered lands. Often, as is the case here, those purposes (conservation, timber harvest, recreational use, etc.) tend to compete with one another. The 2016 RMP acknowledges those competing interests but ultimately concluded that the long-term benefits outweigh any short-term adverse impacts:

> In their biological opinion on the Proposed RMP, the U.S. Fish and Wildlife Service concluded, "Although there are likely to be some adverse effects to murrelets and murrelet critical habitat in portions of the species' range, the overall outcome of [Proposed RMP] implementation will be the protection of the vast majority of extant murrelet nesting habitat, and a large long-term net increase in total area and amount of murrelet habitat during the life of the plan. This approach builds on and continues the basic approach of the original conservation strategy for the murrelet first articulated in the [Northwest Forest Plan] and the recovery plan."

A.R. 10835 (alterations in original).

---

[4] Additionally, language in the final EIS for the 2016 RMP provides support for BLM's argument that the Management Direction's 300-foot buffer requirement applies only to newly discovered occupied nesting sites. *See* A.R. 8837 (emphasis added) ("Management for the marbled murrelet under the Proposed RMP includes . . . a requirement for protection of habitat within 300 feet around *newly discovered* occupied marbled murrelet sites."); A.R. 9677 (emphasis added) ("the proposed RMP would protect lands within 300 feet . . . of *forecasted*, occupied site delineations). Although Plaintiffs conceded at oral argument to BLM's interpretation of the 300-foot buffer requirement, this language in the 2016 RMP suggests BLM did not change course and only adopt the current interpretation to push through the BWE Project.

10 – OPINION & ORDER

The 2016 RMP adopted FWS's recommendation in the Recovery Plan for the NSO to address the present or threatened destruction, modification, or curtailment of threatened habitat: "(1) conserve more occupied habitat and unoccupied high-value habitat; and (2) *encourage and initiate active management actions that restore, enhance, and promote development of high value habitat*, consistent with broader ecological restoration goals." A.R. 19304 (emphasis added). Recognizing the importance of conserving high-value habitat, the 2016 RMP specifically directs BLM to maintain nesting-roosting habitat for the NSO and to "protect marbled murrelet occupied stands" in the LSR.[5] A.R. 10875–76. Likewise, recognizing the importance of increasing the development of high value habitat over the next five decades, the 2016 RMP expressly allows certain activities in the LSR, including "felling and removal of trees for habitat restoration," *even within occupied stands*, provided that "the occupied stand continues to support marbled murrelet nesting." A.R. 10876. In fact, in this context, the RMP specifically acknowledges that "felling and removal of trees for habitat restoration" is one way BLM meets the 2016 RMP's direction to "protect marbled murrelet occupied stands" in the LSR.[6] A.R. 10876. Additionally, FWS, in the BiOp for the BWE Project, acknowledged that "LSR treatments *or treatments within occupied murrelet stands* strive for long-term benefits to forested stands that [] better mimic historical conditions associated with late successional forests found in

---

[5] The 2016 RMP defines marbled murrelet "occupied stands" as "forest stands . . . within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy and not separated from the location of marbled murrelet behavior indicating occupancy by more than 328 feet of non-forest." A.R. 10909

[6] This section of the RMP, perhaps more than any other, seems directly at odds with Plaintiffs' argument that even indirect effects (i.e., "edge effects") upon nesting habitat, from actions taken in lands adjacent to occupied stands, require BLM to survey the stand for evidence of occupation. Other activities allowed *in occupied stands* in the LSR include: felling of hazard trees; construction of spur roads or yarding corridors; and certain "wildfire management actions needed to protect the overall health of the stand or adjacent stands." A.R. 10876. The 2016 RMP specifically allows for each of these activities, *despite the activity occurring in the occupied stand*, "so long as the occupied stand continues to support marbled murrelet nesting." A.R. 10876.

11 – OPINION & ORDER

the Oregon Coast Range Province." A.R. 02133. Recognizing the competing interests and the long-term planning (over five decades) detailed in the 2016 RMP provides further context suggesting BLM's interpretation of "modifying nesting habitat" is, at worst, a reasonable interpretation of an ambiguous term.

In addition to finding BLM's interpretation that indirect edge effects do not trigger the Management Directive to be a reasonable interpretation, the Court finds the BWE Project does not violate the 2016 RMP. Because the BWE Project does not involve any actions "modifying nesting habitat or removing nesting structure," the Management Directive does not apply. Using a variety of tools, BLM:

> *identified forest stands located within the LSR that do not meet the desired owl NRF habitat conditions described in the ROD/RMP. These previously managed, even aged stands do not currently function as Nesting, Roosting and Foraging (NRF) habitat for spotted owl* because they lack sufficient large diameter legacy trees that provide suitable nesting structures, as well as multi-layered canopies and a diversity of tree species that make up high quality spotted owl habitat. *Due to the overly dense conditions found in these stands* (Relative Density (RD) greater than 50%) *they are unlikely to develop into high quality Nesting Roosting and Foraging habitat without stand level disturbance such as the treatments outlined in this EA*.
>
> The MFO used direction outlined in the ROD/RMP (p.66) to apply silviculture treatments to speed the development of spotted owl nesting-roosting habitat.
>
> \* \* \* \*
>
> *In stands within the LSR, that are not spotted owl nesting-roosting habitat, the MFO would apply silvicultural treatments to speed the development or improve the quality of spotted owl nesting-roosting habitat in the stand* or in the adjacent stand in the long term. Limit such silvicultural treatments (other than forest pathogen treatments) to those that do not preclude or delay by 20 years or more the development of spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment. Allow silvicultural treatments that do not meet the above criteria if needed to treat infestations or reduce the spread of forest pathogens.

A.R. 00468, 00473 (emphasis added).

12 – OPINION & ORDER

As outlined above, these actions are consistent with, and supported by, the 2016 RMP. Additionally, because no BLE Project action in LSR consists of directly modifying nesting habitat or removing nesting structure—because BLM limited LSR treatments to stands that did not meet NRF habitat conditions—the Management Directive does not apply. On this point, the Court again points out that even if the BWE Project allowed silviculture treatments *within occupied stands*—it does not—the 2016 RMP allows for the "felling and removal of trees for habitat restoration" *in occupied stands within LSR*, "as long as the occupied stand continues to support marbled murrelet nesting." A.R. 10876.

The Court finds the above framework provides additional support suggesting BLM's interpretation—that indirect edge effects do not consist of "modifying nesting habitat"—is a reasonable interpretation of an ambiguous term. After all, it makes little sense to require strict, 300-foot buffers for potential impacts from indirect edge effects from treatments in adjacent stands while encouraging—with the long-term goal of increasing nesting habitat via habitat restoration treatments—direct impacts from treatments within the occupied stand itself.

The 2016 RMP directs BLM to protect marbled murrelet occupied stands in LSR by, among other actions, cutting and removing trees "for habitat restoration." A.R. 10876. FWS, in the BiOp for the BWE Project, recognized that these treatments "reduce the densities of trees that have developed as closely spaced, single storied stands possessing little species and structural diversity . . . [and] the intent is to improve the species and structural diversity." A.R. 02133. Although Plaintiffs question whether the short-term adverse impacts to marbled murrelet habitat justify, in Plaintiffs view, rather modest advantages to murrelet habitat in 20 years, that argument questions the rationale of the 2016 RMP, not the BWE Project.

B. **Environmental Impact Statement**

Plaintiffs also argue that by failing to prepare an EIS for the BWE Project, BLM acted arbitrarily and capriciously in violation of NEPA. Pls.' Mot. Summ. J. 24–33; Pls.' Reply 21–29. The Court disagrees. BLM was not required to prepare an EIS for the BWE Project.

NEPA is a procedural statute that requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The White House Council on Environmental Quality's NEPA implementing regulations instruct the agency to consider a project's "context" and "intensity" in determining whether impacts will be significant.[7] 40 C.F.R. §1508.27. "Context" refers to the geographic scope and scale of the impacts while "intensity" refers to "the severity of the impact." 40 C.F.R. § 1508.27(a)–(b). A project's intensity is evaluated based on a variety of factors, the most relevant of which include: (1) the action's proximity to "ecologically critical areas;" (2) the degree to which the possible effects are "highly uncertain or involve unique or unknown risks;" (3) whether the action is likely to result in "cumulatively significant impacts;" (4) the degree to which the action "may adversely affect an endangered or threatened species or its habitat;" and (5) whether the action "threatens a violation of Federal, State, or local law[.]" 40 C.F.R. § 1508.27(b)(1)–(10).

An agency may initially prepare an EA to determine whether the environmental impact of a proposed action is significant enough to warrant completion of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document . . . that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." 40 C.F.R. §

---

[7] The BWE Project was developed under the 1978 version the White House Council on Environmental Quality's NEPA regulations. *See* 40 C.F.R. §§ 1500.1–1508.28.

1508.9. A FONSI is "a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.: 40 C.F.R. § 1508.13.

In reviewing an agency's decision not to prepare an EIS under NEPA, courts must determine whether the agency has taken a "hard look" at the consequences of its actions and provided a "convincing statement of reasons to explain why a project's impacts are insignificant." *Blackwood*, 161 F.3d at 1212. However, the courts may not second guess an agency's decision where it relies on the reasonable opinions of its own qualified experts to conclude that the impacts of a project would be insignificant. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

As outlined above, the BWE Project is consistent with the 2016 RMP. In accordance with the 2016 RMP, BLM (and FWS) acknowledge that although the BWE Project may result in short-term adverse effects to the NSO and murrelet, the long-term benefits outweigh any short-term concerns. FWS, in its BiOp prepared for the BWE Project:

> concludes that although adverse effects to the spotted owl, murrelet and their critical habitat are anticipated, the District's implementation of the Big Weekly Elk forest management projects, when implemented consistent with the RMP's Management Directions as well as the Project Design Features, *is not likely to jeopardize the continued existence of the spotted owl or the murrelet or to destroy or adversely modify critical habitat.*

A.R. 02025 (emphasis added).

FWS supported its opinion with nearly 300 pages of analysis, much of which is focused specifically on the NSO and the marbled murrelet. *See* BiOp, A.R. 02024–02302. FWS noted the LSR treatments proposed in the BWE Project focused on "lower-quality" NSO habitats. A.R. 02107; A.R. 02101 (noting "majority of treatments in the Big Weekly Proposed Action are forest

15 – OPINION & ORDER

thinning projects in younger stands located in the reserve allocations. . . . Proposed treatments in LSRs avoid NRF habitat, rather target young and mid-mature Douglas-fir dominated managed forests that were established in an environment lacking disturbance mechanisms."). Although treatments in HLB would "remove and downgrade" about one percent of NRF and RF habitat and "about one percent" of the dispersal-quality habitat in the proposed action area, FWS concluded these "impacts represent a very small proportion at the dispersal-action area; therefore, [BWE Project] will not likely influence dispersal capability at the landscape scale." A.R. 02106.

Consistent with the 2016 RMP, FWS noted that HLB areas were not designed to maintain unoccupied nesting sites but, instead, "are primarily intended to contribute to the ASQ" and "represent a small proportion of the habitat in the action area." A.R. 02106. And while the BWE Project would result in some habitat loss or downgrade in LSR, FWS determined these "impacts are likely to be negligible at the action area scale." A.R. 02107. Ultimately, FWS noted that the 2016 RMP recognized that "substantial removal of spotted owl habitat" would occur in HLB, but this removal "was expected and analyzed within the context of beneficial actions provided by the RMP." A.R. 02120. FWS opined:

> As proposed in Big Weekly Elk, reductions in habitat are expected, but they are accompanied by longer-term benefits expected through the thinning in overstocked stands and plantations by increasing the speed of development of habitat compared to no management.

A.R. 02120.

Similarly, with respect to the marbled murrelet, FWS noted that any adverse impact to the marbled murrelet or its habitat were considered in the 2016 RMP:

16 – OPINION & ORDER

> Habitat removal will further fragment the landscape in the Oregon Coast Range and will preclude habitat development for generations. Large openings created by the clearcuts will exacerbate existing fragmentation in the action area. These long-term impacts were considered in the RMP in the context of the RMP design in its entirety as it was expected to improve the amount, quality and distribution of murrelet nesting habitat over the 50 year life of the RMP and potentially increase the murrelet population every decade with a 52 percent increase in the population over 50 years.

A.R. 02136.

FWS recognized that the BWE Project implemented "seasonal restrictions [that] will significantly minimize or avoid nest disturbance/disruption by applying protective measures to activities . . . to allow for undisrupted murrelets nesting." A.R. 02135. Once again, FWS noted these protections were consistent with the 2016 RMP and the BWE Project's EA. A.R. 02135. FWS concluded that "[d]irect harm to individuals or young is not likely to occur during the implementation of this action." A.R. 02135. Although FWS estimated the BWE Project "will negatively influence the reproductive success associated with four pairs of marbled murrelets," this impact represented only "about 0.06 percent of the population at the Conservation Zone Scale. This impact is unlikely to resonate at the rangewide scale." A.R. 02143. With respect to critical habitat, FWS found "that the action *may adversely affect murrelet critical habitat, but proposed impacts represent an immeasurable impact at the rangewide scale, therefore, effects will not adversely modify the critical habitat network*." A.R. 02150. Ultimately, FWS concluded:

> This action and its associated effects appear consistent with those evaluated in the RMP and are not likely to resonate at the rangewide scale. For the above reasons, we anticipate that the treatments *may affect, and is likely to adversely affect*, the marbled murrelet and its designated critical habitat; however the impacts are not likely to jeopardize the species or adversely modify critical habitat at the Conservation Zone or rangewide scale.

A.R. 02152.

17 – OPINION & ORDER

In its FONSI, BLM determined the BWE Project would not introduce any significant adverse effects beyond those already considered in the 2016 RMP. A.R. 00434. Although BLM acknowledged the BWE Project may adversely affect NSO and marbled murrelet habitat, that finding did not require the agency to find the record required a finding of significance. *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006); *see Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005) (noting that adverse impacts do not "automatically make the project 'highly controversial' or "highly uncertain'"). Instead, "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." *Id.* Here, the Court concludes that BLM did just that. Additionally, BLM determined—just as FWS had previously determined—that the BWE Project complied with the 2016 RMP. A.R. 436–37. The Court concludes BLM did not violate NEPA by concluding the BWE Project only required an EA, not an EIS.

**C.  Hard Look**

For similar reasons as those outlined above, the Court concludes BLM took the requisite "hard look" at the environmental impacts of the BWE Project. *See 350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.* 538 F.3d 1172, 1194 (9th Cir. 2008)) ("To satisfy the 'hard look' requirement, an agency must provide 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'").

The EA did not ignore potential indirect edge impacts. Instead, the EA acknowledged that "[t]hinning of buffer habitat may also affect murrelets by impacting the buffering habitat's

18 – OPINION & ORDER

ability to provide for windthrow during storms, provide a microclimate that supports moss growth, and/or provides a stand with low usage by murrelet nest predators." A.R. 2134. As outlined above, the BLM (and FWS) concluded those potential harms were acknowledged in the 2016 RMP. Likewise, the 2016 RMP fully analyzed the fact that individual timber sales in the relevant area would impact the NSO, the marbled murrelet, and their respective habitats. As described above, the 2016 RMP ultimately concluded the long-term benefits outweighed any short-term concerns. Similarly, although the EA did not analyze in detail impacts to the marbled murrelet, it considered the issue and concluded the BWE Project "is not associated with significant impacts beyond those analyzed in the Final PRMP/FEIS to which this EA tiers." A.R. 00564 (internal citation omitted). As demonstrated above, the Court agrees.

Finally, although Plaintiffs argue BLM failed to consider cumulative effects from nearby logging projects, those projects were either (1) not far enough along for the BLM to factor in any impacts from those future projects or (2) outside the 1.5 mile radius for NSO outlined in the survey protocol for the relevant range. A "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. A proper analysis of the cumulative impacts of a project requires at least "some quantified or detailed information . . . about possible effects . . . absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998). Here, the justification is (1) those other projects were not far enough along to provide enough information for the BLM to

analyze their potential cumulative impacts; (2) the projects were outside the relevant geographic scope for consideration; and (3) impacts from those projects were fully analyzed and considered in the 2016 RMP. NEPA requires no additional justification.[8]

## IV. CONCLUSION

For the reasons outlined above, BLM's Motion for Summary Judgment (ECF No. 23) is GRANTED and Plaintiffs' Motion for Summary Judgment (ECF No. 16) is DENIED.

IT IS SO ORDERED.

DATED this 28th day of June, 2024.

/s/ Michael McShane
Michael McShane
United States District Judge

---

[8] BLM points out that Plaintiffs conceded in their comments that the proposed projects were not far enough along to allow for meaningful analysis. BLM Reply, 29 (quoting A.R. 01074 ("without knowing where roads will be constructed, where timber sale units will be located, what the current stand conditions are, or what wildlife or plants are present in a particular forest stand, it is impossible to document site-level analysis of effects.")). To the extent this lack of specifics prevented BLM from conducting any meaningful analysis, the Court agrees.